UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DEMAJIO JEROME ELLIS,     )
     )
     Plaintiff,     )
     )
     v.     )     Case No. 3:14-CV-1575 JD
     )
SERGEANT MYERS, et al.,     )
     )
     Defendants.     )

## OPINION AND ORDER

While an inmate at Westville Correctional Facility, plaintiff Demajio Jerome Ellis was injured during an altercation with correctional officers on November 22, 2013, causing him a cut to his shoulder, bruising, swelling, and headache. Mr. Ellis filed this cause of action pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment rights related to the incident. He brings a claim of deliberate indifference to his medical needs against defendant Tawnya Lukac, LPN and defendant Sergeant Myers. Mr. Ellis also alleges claims against defendants Sergeant Myers, Sergeant Sexton, and Officer Backus for confining him in a cold cell and for using excessive force. Nurse Lukac now moves for summary judgment on the claim of deliberate indifference to Mr. Ellis' medical needs, and the Officers move for partial summary judgment, seeking summary judgment only on the claims for denial of medical care and the conditions of confinement in a cold cell. For the reasons set forth in this order, the Court grants both motions.

## I. FACTUAL BACKGROUND

At the time of the relevant events, Mr. Ellis was incarcerated at the Westville Correctional Facility (Westville). Pl.'s Compl. 1, ECF No. 1; Lukac's Ex. A., Lukac Dep. ¶ 6, ECF No. 166-1. Nurse Lukac was a licensed practical nurse at Westville providing medical care to offenders. Lukac's Ex. A., Lukac Dep. ¶ 5.

1

Nurse Lukac is trained in identifying and treating patients in emergency situations and has experience in assessing patients with common ailments, including injuries after an altercation. *Id.* ¶ 4. As part of her work at Westville, Nurse Lukac triages offenders and determines if an offender's complaints present as a serious medical condition requiring immediate physician review. *Id*. ¶ 5. If she determines that an offender presents with a serious medical condition, she performs a physical examination and communicates the offender's complaints and her objective findings to the onsite physician for orders and then follows those orders. *Id*. Nurse Lukac was familiar with Mr. Ellis' medical history of resisting officers and refusing medical treatment. *Id*. ¶ 6.

On November 21, 2013, Nurse Janice West examined Mr. Ellis after he was sprayed with OC (pepper) spray by correctional officers. Lukac's Ex B. pp. 1–4, Med. Rec., ECF No. 166-2. Mr. Ellis refused medical treatment. *Id*. at 1. Nurse West noted that Mr. Ellis was alert and oriented, ambulated with a steady gait, and appeared calm as soon as he was handcuffed. *Id*. Mr. Ellis told Nurse West that he planned to hang himself with a bedsheet, which Nurse West relayed to mental health. *Id*. Mr. Ellis was placed on suicide observation that evening. *Id*. at 6.

The next morning, November 22, 2013, mental health professional (MHP) Nicholas Wardell charted that, the day before, Mr. Ellis had gotten into a verbal altercation with correctional officers. *Id*. at 6. In his deposition, Mr. Ellis acknowledged that he had resisted officers in the past and refused medical care because he was angry. Lukac's Br. Ex. E, Ellis Dep. 23:14–19, 59:9–60:25, ECF No. 166-5.

While he was on suicide watch, the water in Mr. Ellis' cell was turned off. Officers' Br., Ex. A, Ellis Dep. 7:9–19, 9:1–3. On November 22, 2013, when he returned to his cell, the water was still off, and, when the staff did not respond to his requests over two hours that the water be

turned on so that he could use the toilet, he threw his feces on the range two times. *Id.* 9:4–10:1; Pl.'s Supp., Ellis Dep. 66:15–67:13, 68:4–24, ECF No. 182; *see also* Lukac Br., Ex. C, Report Forms, p. 3, ECF No. 166-3.

As a result, Mr. Ellis was escorted to the intake receiving cell at approximately 12:15 p.m. while his cell was being cleaned. Officers' Br., Ex. A, 10:2–4; Ex. B, Inter. 4; Lukac Br., Ex. C, Report Forms, p. 3. While in the intake receiving cell, Mr. Ellis was stripped down to his boxer shorts and his clothes were confiscated for weapons that could be used against staff or for objects that bodily fluid could be stored in. Officers' Br., Ex. A, 12: 2; Ex. C, Myers Inter. No. 13. Mr. Ellis was in the intake receiving cell for approximately three hours. Officers' Br. Ex. A, Ellis Dep. 10:3–4, 16–18; *see also* Lukac Br., Ex. C, Incident Report Forms, pp. 3. During this time, Mr. Ellis' cell was being cleaned. Officers' Br., Ex. B., Sexton Inter. 4); Lukac Br., Ex. C, Report Forms, p. 3. The Incident Report indicates that Mr. Ellis would be taken back to his cell at 3:00 p.m. Lukac Br., Ex. C, Incident Report Forms, p. 3.

Mr. Ellis testified that the intake cell was "very cold"; he was unable to give a temperature. Pl.'s Supp., Ellis Dep. 10:19–25. Mr. Ellis testified that he knew it was cold because it was November and the intake cell was connected to the garage, where air flowed in under the garage door. *Id.* 10:25–11:14. He also explained that the air conditioner blows right above the intake cell. *Id.* 11:16–17. There were no officers walking by; Mr. Ellis was not able to tell officers that he was cold; and he did not try to get the officers' attention to ask for clothes or other accommodations. Officers' Br., Ex. A, Ellis Dep. 11:21–12:1; Pl.'s Supp., Ellis Dep. 69:18–19.

At approximately 3:15 p.m., Mr. Ellis was given clothing, and Sergeant Sexton and Sergeant Myers escorted Mr. Ellis from the intake receiving cell to his cell in B-Pod. Lukac's Br.

Ex. C, ECF No. 166-3; Officers' Br., Ex. A, Ellis Dep. 12:16–13:16; Pl.'s Supp., Ellis Dep. 87:
20–22. Sergeant Myers reported that, as he and Sergeant Sexton entered B-Pod, Mr. Ellis started
physically resisting them by shoving his shoulder into Sergeant Myers and spitting on him.
Lukac's Br. Ex. C, ECF No. 166-3, p. 1. However, Mr. Ellis testified that, upon arriving at his
cell, the officers picked him up over their heads and threw him onto his mattress that was on the
floor next to the wall. Pl.'s Supp., Ellis Dep. 75:8–21, 76:24–77:4. Mr. Ellis' head hit the
concrete wall. *Id*. 78:11–20. The officers proceeded to kick, punch, and elbow Mr. Ellis while he
was on the floor. *Id*. at 80:22–81:9, 82:9–18.

      The report provides that the officers secured Mr. Ellis on the ground and Sergeant Sexton
called in the event at 3:16 p.m. Lukac's Br. Ex. C, Incident Report Forms. First responders
arrived and helped escort Mr. Ellis back to the intake receiving cell by carrying him. *Id*.;
Officers' Br., Ex. A, Ellis Dep. 15:22–17:1. The report provides that Mr. Ellis continued to resist
staff by pulling away. Lukac's Br. Ex. C, Incident Report Forms. Mr. Ellis testified that, while
taking him back to the intake receiving cell, the officers forcibly made it difficult for him to walk
through use of the "leash" and shackles. Pl.'s Supp., Ellis Dep. 86:7–87:12. And, at the intake
receiving cell, the officers slammed Mr. Ellis' head against the door before putting him inside.
*Id*. 87:13–22.

      Once back in the intake receiving cell, Mr. Ellis was again stripped down to his boxer
shorts. Lukac's Br. Ex. C, Incident Report Form, p. 1. Mr. Ellis testified that Officer Myers put
his knee on Mr. Ellis' head, crushing his face into the hard floor, to hold him down while his
clothes were removed. Pl.'s Supp., Ellis Dep. 88:7–20.

      Mr. Ellis testified that, as a result of the incident, he experienced a three-to-four
centimeter cut on his right shoulder blade, cuts and swelling on his wrist and ankles from the leg

irons, bruising on his thighs and arms, a small knot on his head, and headaches. Lukac Ex. E, Pl.'s Dep. 20:10–23, 99:2–100:23. Mr. Ellis testified that, except for the headaches, the injuries resolved in four to five days. *Id*. at 22:21–22, 99:10–100:23. The wound on his shoulder formed a scab, healing within a few days. *Id*. at 100:12–23. The headaches lasted six months. Pl.'s Supp., Ellis Dep. 104:9–25.

Mr. Ellis testified that, after the intake receiving cell door was closed and the shackles were removed, he asked Officer Myers to see the nurse and Officer Myers responded that Mr. Ellis wouldn't be seeing anyone and walked away. *Id*. 89:14–90:3. In contrast, the Incident Report indicates that Mr. Ellis refused medical treatment. Lukac's Br. Ex. C, ECF No. 166-3. The Incident Report also states that Nurse Lukac was notified and spoke to Mr. Ellis. *Id*. Sergeant Myers stated in his interrogatory response, "Ellis stated to me and Sgt. Sexton that he did not want medical attention. Ellis refused to sign a refusal form for medical . . . ." Defs.'s Mot. for Summ. J., Ex. C ¶ 12, ECF No. 169-3. Sergeant Myers further states, "I notified LPN Lukac. I do recall LPN Lukac going to the receiving area door and hearing Ellis being loud and threatening. Ellis stated to me and Sgt. Sexton that he did not want medical . . . . Mental health (Mr. Wardel) was notified as well of Ellis' behavior." *Id*. ¶ 10.

Mr. Ellis testified that he did not refuse treatment. Pl.'s Supp., Ellis Dep. 19:24–20:3. Mr. Ellis testified that, after the officers left him in the receiving cell in his boxer shorts, he yelled for a nurse for twenty to thirty minutes. Lukac's Br. Ex. E, Ellis Dep. 19:7–23; Pl.'s Supp., Ellis Dep. 92:3–5. Mr. Ellis testified that he wanted an ice pack for his swelling, alcohol for his cuts, and just wanted to be attended to. Lukac's Br. Ex. E, Ellis Dep. 91:13–25.

In her Affidavit, Nurse Lukac states that, on the afternoon of November 22, 2013, she was working in the medical unit at Westville with Nurse Ryan Moore when they received a

telephone call from officers regarding Mr. Ellis. Lukac's Br. Ex. A, Lukac Aff. ¶¶ 8–9; Lukac's Br. Ex. B, Med. Recs. pp. 7–9. Nurse Lukac understood that officers told Nurse Moore that Mr. Ellis had been resisting officers and was being held in a receiving cell because he was combative. Lukac's Br. Ex. A, Lukac Aff. ¶ 9. Nurse Lukac states that Officers told Nurse Moore that Mr. Ellis refused medical care and refused to sign a refusal of treatment. *Id*. Nurse Moore reported this to Nurse Lukac, and both Nurse Moore and Nurse Lukac completed a refusal of treatment form. *Id*. Nurse Lukac states that it is not uncommon for the nurses to fill out refusal of treatment forms when offenders refuse medical care. *Id*. Nurse Lukac states that, once an offender refuses medical care, nursing staff is not authorized to initiate further care or force unwanted care on offenders. *Id*.

Later, Nurse Lukac was walking by the intake receiving cell when Mr. Ellis began yelling out to her from the cell. Lukac's Br. Ex. A, Lukac Aff. ¶ 10. Mr. Ellis agrees that, after he had been yelling for twenty to thirty minutes, Nurse Lukac stopped at the intake receiving cell and opened the door that separates the hallway from the cell to speak with him. Lukac's Br. Ex. E, Ellis Dep. 19:17–20:9; Pl.'s Supp., Ellis Dep. 92:6–17. Nurse Lukac stood approximately fifteen feet away from Mr. Ellis during this interaction. Lukac's Br. Ex. E, Ellis Dep. 93:9–11; Pl.'s Supp., Ellis Dep. 93:9–11. Mr. Ellis testified that he told Nurse Lukac that he had "injury" and "pains" and needed to see the nurse. Lukac's Br. Ex. E, Ellis Dep. 19:22–23; Pl.'s Supp., Ellis Dep. 92:11–12. However, he testified that he did not specify his injuries to Nurse Lukac. Lukac's Br. Ex. E, Ellis Dep. 22:2–7. Mr. Ellis testified, "And she said she can't come back there by [herself]. I told her I need her to come here. She said I can't come back there by myself. I said go get Lieutenant Washington. She said something, then she left. She never came back." *Id*. 20:4–9; *see also* Pl.'s Supp., Ellis Dep. 92:6–17, 93:12–13. Nurse Lukac describes Mr. Ellis as swearing

at her and demanding that she come into his cell. Lukac's Br. Ex. A, Lukac Aff. ¶ 10. She told him that she could not enter the cell without an officer present. *Id*. Nurse Lukac states in her Affidavit that she could not enter the receiving cell without an officer present for safety purposes. *Id*.

During this interaction, Mr. Ellis was wearing just his boxer shorts, and Mr. Ellis testified that Nurse Lukac could see most of his body. Lukac's Br. Ex. E, Ellis Dep. 107:12–18. Nurse Lukac states that she visually examined Mr. Ellis and evaluated his condition. Lukac's Br. Ex. A, Lukac Aff. ¶ 11. Nurse Lukac observed that Mr. Ellis had no visible injuries, had even and unlabored respirations, and did not display any signs or symptoms of physical distress. *Id*. Nurse Lukac states that Mr. Ellis remained combative and verbally abusive and that she feared for her safety. *Id*. Nurse Lukac reported Mr. Ellis' behavior to correctional officers and completed a conduct report. *Id.* Mr. Ellis was returned to his cell in B-pod at approximately 7:00 p.m. Pl.'s Supp., Ellis Dep., 24:6–12.

On November 22, 2013, Nurse A. Laska noted on the segregation rounds flow sheet that Mr. Ellis was awake and verbal with no complaints. Lukac's Br. Ex. B, Med. Recs. p. 10.

The next day, November 23, 2019, Mr. Ellis submitted a Request for Health Care form, stating, "I got jumped by officer[s] and they refused my medical need." Lukac's Br. Ex. B, Med. Recs., p. 11. Therein, Mr. Ellis complained of bruising on his left arm and shoulder blades, a knot under his chin, swollen wrist and ankles, and a headache. *Id*. At 9:00 p.m. that evening, Nurse Laska performed a segregation round check, noting that Mr. Ellis was alert, awake, and had no complaints. *Id*. p. 10.

On November 25, 2013, Nurse Jocelyn Bigheart examined Mr. Ellis in nursing sick call for his complaints and did not chart any injuries. *Id*. at p. 12–13. Mr. Ellis testified that Nurse

Bigheart visually examined his shoulder and wrists, wiped the cut on his shoulder with an alcohol pad, and advised Mr. Ellis to submit a healthcare request if he experienced additional complaints. Lukac's Br. Ex. E, Ellis Dep. 26:1–10. Mr. Ellis also spoke with MHP Wardell who reported that Mr. Ellis stated he wanted to report "getting beat-up by officers." Lukac's Br. Ex. B, Med. Recs., p.14–15. MHP Wardell did not note any complaint of physical injuries by Mr. Ellis. *Id*. Also that day, Mr. Ellis met with his case manager Doug Barnes regarding the November 22, 2013 incident, reporting complaints about custody staff leading up the incident, the assault by custody staff, and mental health staff not taking his requests for medication seriously. Lukac's Br. Ex. D, Case Notes. p. 1, ECF No. 166-4. Mr. Barnes did not note any complaint by Mr. Ellis regarding physical injuries or medical staff ignoring his needs. *Id*.

On November 28, 2013, Mr. Ellis submitted a Request for Health Care form regarding the November 22, 2013 altercation, alleging denial of medical care and stating that he felt unwanted, wanted to die, and needed to speak with someone before "it's too late." Lukac's Br. Ex. B, Med. Recs., p. 16. Mr. Ellis did not complain of his physical injuries. *Id*. The same day, MHP Wardell met with Mr. Ellis in an individual therapy session and diagnosed him with antisocial personality disorder. Lukac's Br. Ex. B., Med. Recs. pp. 17–19. During the session, Mr. Ellis began accusing MHP Wardell and his psychiatrist of denying him medical services and asked that it be recorded that his symptoms were being ignored. *Id*.

On December 4, 2013, Mr. Ellis submitted a Request for Health Care form, asking to be seen by medical staff about his injuries from two weeks earlier. Lukac's Br. Ex. B, Med. Recs. p. 22. On December 6, 2013, at 7:37 a.m., MHP Wardell saw Mr. Ellis for continued mental health monitoring. *Id*. at 23–25. MHP Wardell's report provides that Mr. Ellis was irritable and uncooperative during the visit, complained of being denied medications, and reported his

perception that he was neglected and denied treatment. *Id*. at 24. Mr. Ellis reported that counseling did not help him and refused an out-of-cell visit. *Id*.

Also on December 6, 2013, at 4:34 p.m., Nurse Moore examined Mr. Ellis in the medical unit. *Id*. at 26–32. Mr. Ellis reported bruising around his left wrist and right ankle and requested x-rays and pain medication. *Id*. at 30. Nurse Moore charted that Mr. Ellis ambulated with a steady gait into the medical unit. *Id*. Nurse Moore saw no apparent injury, and Mr. Ellis did not have bruising, tenderness, or limited range of motion in his wrist or ankle, had no open areas or sores on his body, and had no signs or symptoms of distress. *Id*. Nurse Moore diagnosed Mr. Ellis with a potential sprain, and Dr. Jackson gave a verbal order for ibuprofen, a general lay-in pass, and warm compresses. *Id*. Dr. Jackson ordered x-rays of Mr. Ellis's left wrist and left ankle. *Id*. The x-rays of Mr. Ellis' left wrist and left ankle were normal. *Id*. at 33.

On December 16, 2013, Mr. Ellis submitted a Request for Health Care form, complaining of ongoing headaches and pain in his wrist and ankle. *Id*. at p. 34. Dr. Andrew Liaw examined Mr. Ellis the next day, and Mr. Ellis complained of persistent pain and a "bump in his hand." *Id*. at 35–37. Mr. Ellis reported that swelling had resolved. *Id*. Dr. Liaw noted that, on physical exam, Mr. Ellis sighed loudly in regular intervals. *Id*. at 35. Dr. Liaw's physical examination, which focused on Mr. Ellis' hands, was unremarkable. *Id*. Dr Liaw reviewed Mr. Ellis' x-rays of his writs with him and told him they were normal. *Id*. Dr. Liaw wrote that Mr. Ellis was unhappy that his scans did not show a fracture or an acute injury. *Id*. Mr. Ellis mentioned that he was in the process of suing officers and providers. *Id*. Dr. Liaw diagnosed Mr. Ellis with a possible sprain with no bruising. *Id*.

On March 12, 2014, Mr. Ellis submitted a Request for Health Care form, complaining of headaches from the November 22, 2013 incident and numb left fingers. *Id*. at 38. On March 23,

2014, Nurse Moore saw Mr. Ellis for his headache complaints, and Mr. Ellis rated his pain at 5/10. *Id*. at 39–41. Nurse Moore noted that Mr. Ellis's exam was normal with some weakness noted to his left hand. *Id*. at 41. Mr. Ellis displayed no signs or symptoms of distress. *Id*. Mr. Ellis was prescribed acetaminophen. *Id*.

On March 28, 2014, Dr. Liaw examined Mr. Ellis for his headache and left hand complaints. *Id*. at 42–44. Dr. Liaw noted that, on exam, Mr. Ellis had tenderness to palpitation to the left temple, but his exam was otherwise unremarkable. *Id*. at 42. Dr. Liaw noted that Mr. Ellis reported pounding in his temples and sensitivity to light but that, on eye examination, Mr. Ellis did not wince or show sensitivity to light. *Id*. As for Mr. Ellis' wrist, Dr. Liaw's exam revealed no tenderness, normal grip strength, and no signs of discomfort to Mr. Ellis' left hand. *Id*. Dr. Liaw diagnosed Mr. Ellis with a sprain. *Id*. Dr. Liaw ordered acetaminophen. *Id*.

On May 16, 2014, Dr. Liaw examined Mr. Ellis for his ongoing headache complaints. *Id*. 45–49. Dr. Liaw's head and shoulder exams were normal with no mass effect. *Id*. 45. Dr. Liaw ordered acetaminophen as needed, but Mr. Ellis refused treatment recommendations. *Id*. 47. Mr. Ellis' medical records contain three additional records dated June 5, 2014, December 18, 2014, and November 22, 2015, each of which indicates that Mr. Ellis refused medical treatment after an incident. *Id*. 50–52.

Mr. Ellis filed a *pro se* complaint in this case on May 19, 2014, and an amended *pro se* complaint on July 18, 2014. Pursuant to 28 U.S.C. § 1915A, the Court screened the amended complaint and granted Mr. Ellis leave to proceed on his Eighth Amendment claims against Nurse Lukac, Sergeant Myers, Sergeant Sexton, and Officer Backus in their individual capacities, dismissing all other claims. The Court granted Mr. Ellis leave to proceed against Nurse Lukac in her individual capacity for denying him medical treatment around 3:30 p.m. on November 22,

2013. As to the Officers, Mr. Ellis was granted leave to proceed on his claims of denial of medical care, being placed in a cold cell, and excessive force on November 22, 2013.

Although initially denied, the Court ultimately granted Mr. Ellis' motion to recruit counsel, so he is now represented.[1] Discovery was conducted, including the deposition of Mr. Ellis in November 2018. Nurse Lukac filed her motion for summary judgment on March 18, 2019, and the Officers filed their motion for partial summary judgment on March 19, 2019. Both motions are fully briefed and ripe for ruling.

## II. STANDARD OF REVIEW

A court must grant summary judgment if the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations contained in its pleadings but must present evidence

---

[1] The Court thanks Attorney Hull for his willingness to represent Mr. Ellis and for ably discharging his duties before his appearance was withdrawn. Likewise, the Court thanks Attorney J. Thomas Vetne for his willingness to subsequently represent Mr. Ellis and for ably discharging his duties.

sufficient to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

## III. DISCUSSION

Mr. Ellis' amended complaint is brought pursuant to 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment rights related to an altercation with correctional officers on November 22, 2013. Nurse Lukac seeks summary judgment on Mr. Ellis' claim of denial of medical care, arguing that Mr. Ellis did not have an objectively serious medical need and that she did not knowingly disregard a risk to his health. Sergeant Myers moves for summary judgment on Mr. Ellis' claim that Sergeant Myers denied him medical care that day by falsely reporting that Mr. Ellis refused medical care; Sergeant Myers argues that he notified the medical staff of Mr. Ellis' location and condition and that the nursing staff responded to Mr. Ellis. Finally, Sergeant Myers, Sergeant Sexton, and Officer Backus ask the Court for summary judgment on Mr. Ellis' claim that his confinement in a cold cell violated the Constitution, arguing that Mr. Ellis has not offered evidence of an objectively serious deprivation or that the Officers were deliberately indifferent. The Court considers the Defendants' motions for summary judgment on each of these claims in turn.

### A. Denial of Medical Care

The Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). To survive summary judgment, Mr. Ellis must offer evidence suggesting that he suffered an objectively serious medical condition and that Nurse Lukac and Sergeant Myers acted with deliberate indifference to that medical need. *See Farmer*, 511 U.S. at 834; *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016).

### 1.    Serious Medical Need

First, a medical need is objectively "serious" if it is one that a physician has diagnosed as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Palmer v. Franz*, 928 F.3d 560, 563–64 (7th Cir. 2019) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A medical condition need not be life-threatening to be serious. *Gutierrez v. Peters*, 111 F.3d 1364, 1370 (7th Cir. 1997). However, not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Id*. at 1372.

In this case, Mr. Ellis experienced a minor cut, bruising, swelling, and recurring headaches as a result of the incident with correctional officers. The Seventh Circuit Court of Appeals has held that a prisoner's split lip and swollen cheek were not a serious medical need under the Eighth Amendment. *Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006) (discussing *Davis v. Jones*, 936 F.2d 971, 972–73 (7th Cir. 1991)). In another case, the Seventh Circuit held that minor scrapes and bruises did not amount to a serious medical need. *Zentmyer v. Kendall Cty., Ill.*, 220 F.3d 805, 810 (7th Cir. 2000) (reasoning that failure to treat "the sorts of ailments for which many people who are not in prison do not seek medical attention—does not . . . violate the Constitution" (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996))).

Mr. Ellis' minor cut, bruising, and swelling do not constitute a serious medical need. Mr. Ellis testified that these conditions resolved within days. And, the medical records are consistent with the mild nature of Mr. Ellis' injuries. On November 22 and November 23, 2013, Mr. Ellis was monitored on segregation rounds by medical staff and no injuries were noted in the chart. On November 25, 2013, Nurse Bigheart examined Mr. Ellis who reported cuts, bruises, pain in his finger, and headaches; Nurse Bigheart did not note any serious injuries in Mr. Ellis' medical

record. Nurse Bigheart wiped Mr. Ellis' cut with an alcohol pad and advised him to submit a healthcare request form if he experienced additional complaints. MHP Wardell and Mr. Ellis' case manager both spoke with Mr. Ellis on November 25, 2013, but neither recorded any complaints of injury. Several medical providers examined Mr. Ellis when he complained of ongoing swelling and pain, but no provider noted an acute injury or an injury posing a serious health risk. Mr. Ellis' physical examinations were unremarkable, and the x-rays did not reveal an injury. For these injuries, Mr. Ellis has not presented evidence of an objectively serious medical need. *See, e.g.*, *Scholes v. Fayette Cty. Jail*, Civil No. 11-140, 2011 WL 2115874, at *4 (S.D. Ill. May 26, 2011) (finding that the plaintiff's injuries, which were the "the normal incidents of fighting, e.g., abrasions, bruising, and mild bleeding," were not objectively serious); *Alvarado v. Battaglia*, 539 F. Supp. 2d 1022, 1027–28 (N.D. Ill. Feb. 13, 2008) (finding that a small cut on the lip and a scraped, swollen knee were minor injuries and not objectively serious); *Caldwell v. McEwing*, No. 00-1319, 2006 WL 2796637, at *11 (C.D. Ill. Sept. 28, 2006) (finding that a swollen eye and a 1/2-inch cut not requiring stitches did not constitute a serious medical need).

As for his headaches, Mr. Ellis cites case law that a serious medical condition can include "chronic and substantial pain." Pl.'s Br. 5, ECF No. 178 (quoting *West v. Millen*, 79 F. App'x 190, 193 (7th Cir. 2003)). He then notes that he complained of chronic headaches for six months after the November 22, 2013 incident. However, the evidence of record does not support a finding of "chronic and substantial pain" from headaches. Although Mr. Ellis listed headaches as a complaint in his November 23, 2019 Request for Health Care, on examination on November 25, 2013, Nurse Bigheart did not chart any complaint of headache or treat Mr. Ellis for headache. Mr. Ellis' November 28, 2013 Request for Health Care asked for mental health treatment and did not list any physical injuries. On December 4, 2013, Mr. Ellis asked generally for treatment of

his "injuries," and during the December 6, 2013 examination by Nurse Moore, Mr. Ellis complained of black marks and pain around his wrists; there is no notation that he complained of or was treated for headaches. On December 16, 2013, Mr. Ellis requested health care because he continued to have "major headaches." Yet, when Dr. Liaw examined him the following day, Mr. Ellis presented with a hand injury, and Dr. Liaw conducted a thorough examination of both hands. Dr. Liaw did not note any complaint of headaches.

Mr. Ellis did not receive medical treatment for headaches from the November 22, 2013 incident until three months later, in March 2014. Mr. Ellis described the headaches as sharp in the temples and a 5/10 on a pain scale. On examination, Dr. Liaw found that Mr. Ellis had tenderness to palpitation to the left temple, but the examination was otherwise unremarkable. Dr. Ellis noted that, despite Mr. Ellis' assertion of sensitivity to light, Mr. Ellis did not draw back or show sensitivity to light when Dr. Liaw used the ophthalmoscope on his eyes. Dr. Liaw prescribed acetaminophen. A similar examination and treatment occurred in May 2014, which was the last record of any treatment for headaches, despite unrelated medical records dated June 5, 2014, December 18, 2014, and November 22, 2015. These minor, recurring headaches do not implicate the Eighth Amendment. *See Cooper*, 97 F.3d at 916.

Even viewing the facts in the light most favorable to him, Mr. Ellis has not raised a genuine dispute of material fact that he suffered from an objectively serious medical condition within the meaning of the Eighth Amendment on November 22, 2013. Therefore, summary judgment on Mr. Ellis' denial of medical care claims against Nurse Lukac and Sergeant Myers is granted on this basis.

## 2. Deliberate Indifference

Deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks omitted). This element requires a dual showing that the defendant (1) had subjective knowledge of a risk to the inmate's health, and (2) intentionally disregarded that risk. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010); *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010).

### a. Nurse Lukac

"For a medical professional to be liable for deliberate indifference to an inmate's medical needs, [she] must make a decision that represents such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks omitted) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). "[I]nadvertent error, negligence, or even ordinary malpractice" do not constitute deliberate indifference. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). Mr. Ellis has not offered evidence that Nurse Lukac was deliberately indifferent to his medical needs.

The undisputed facts show that Nurse Lukac learned from the phone call to Nurse Moore that Mr. Ellis had been resisting officers and was combative and that Mr. Ellis had refused medical care and refused to sign a refusal of treatment. Although Mr. Ellis testified that he did not refuse treatment and, in fact, asked Officer Myers for medical care, there is no evidence that Nurse Lukac was aware of that. Later, while walking past the intake cell, Nurse Lukac heard Mr.

Ellis call out. She stopped at the cell and responded to him. Nurse Lukac observed Mr. Ellis, who was clothed only in his boxer shorts, and visually assessed his condition. In her medical judgment, she found that he did not require medical attention.

To the extent Mr. Ellis argues that his injuries were more serious than they appeared based on the nature of the alleged excessive force, there is no evidence that Nurse Lukac knew any facts regarding the incident with the correctional officers or the nature of the excessive force Mr. Ellis alleges was used against him. Although Mr. Ellis asked Nurse Lukac for medical care, he did not tell her about any specific injuries. There is no evidence that Mr. Ellis reported a headache to Nurse Lukac or that he displayed any signs or symptoms of a head injury. In other words, there is no evidence that Nurse Lukac knew of a head injury, a headache, or any other injury beyond what she observed in the receiving cell. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (explaining that a defendant is deliberately indifferent "only if [she] '*knows of* and disregards an excessive risk to inmate health or safety'" (quoting *Farmer*, 511 U.S. at 837)); *Petties*, 836 F.3d at 728 (same).

Moreover, Mr. Ellis has not identified evidence that Nurse Lukac's assessment of his condition was deficient in light of the information known to her. Contrary to Mr. Ellis' argument that he received no medical care, Nurse Lukac responded to Mr. Ellis' general request for medical care. She observed him in the intake receiving cell, knowing that he had been in an altercation with correctional officers, and determined that he did not require treatment.

Finally, there is no evidence that Nurse Lukac's determination that Mr. Ellis did not require treatment departed from accepted medical judgment or standards. As described above, three days after the incident, Nurse Bigheart examined Mr. Ellis and did not chart any injuries. Nurse Bigheart visually examined his shoulder and wrists and wiped the cut on his shoulder with

an alcohol pad. Mr. Ellis testified that, other than his headaches, his injuries resolved within several days. Again, Mr. Ellis did not specify any injuries to Nurse Lukac other than a general request for care. Mr. Ellis has not offered evidence that Nurse Lukac's decision not to return later to the intake cell represented so substantial a departure from accepted professional judgment as to demonstrate that she actually did not base her decision on such a judgment. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [responded the same] under those circumstances." (internal quotation marks omitted) (quoting *Sain*, 512 F.3d at 894–95)); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (holding that a prisoner is not entitled "to demand specific care" or "to the best care possible" but only "to reasonable measures to meet a substantial risk of serious harm").

Viewing the facts in the light most favorable to Mr. Ellis, Mr. Ellis has not shown that Nurse Lukac knew of and disregarded an excessive risk to Mr. Ellis' health, and no reasonable juror could conclude that Nurse Lukac was deliberately indifferent to Mr. Ellis' medical condition. If Mr. Ellis suffered any damages, they were not the result of a constitutional violation on the part of Nurse Lukac.

### b. Sergeant Myers

The prohibition on deliberate indifference to serious medical needs applies not only to medical personnel but also to prison guards who interfere with an inmate's access to medical care. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). In *Greeno v. Daley*, the Seventh Circuit Court of Appeals found that a non-medical prison official was not deliberately indifferent by failing to take further action once he had referred the inmate's situation to medical providers. 414 F.3d 645, 655–56 (7th Cir. 2005) ("[W]e can see no deliberate indifference given that [the

corrections complaint appeals examiner] investigated the complaints and referred them to the medical providers who could be expected to address [the inmate's] concerns."). And, the Seventh Circuit has reaffirmed that the "policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008).

Sergeant Myers argues that he was not deliberately indifferent to Mr. Ellis' medical needs on November 22, 2013, at approximately 3:15 p.m., because Sergeant Myers informed the medical staff, specifically the nurses, that Mr. Ellis was in the intake receiving cell. Officers' Br., Ex. C, Myers Inter. 9. However, viewing the facts in the light most favorable to Mr. Ellis, as the Court must on summary judgment, Mr. Ellis requested medical care from Sergeant Myers, Sergeant Myers told Mr. Ellis that he would not get any treatment, and Sergeant Myers falsely reported to the nurses that Mr. Ellis had refused treatment. Nevertheless, approximately 20 to 30 minutes after Sergeant Myers reported the altercation to the nurses and told them that Mr. Ellis was located in intake receiving cell, Nurse Lukac stopped at the cell and spoke with and observed Mr. Ellis. Sergeant Myers was aware of Nurse Lukac's visit. At that point, Sergeant Myers had discharged his duty to ensure that Mr. Ellis received medical treatment for his injuries. Finally, even if Sergeant Myers' false report to the nurses that Mr. Ellis refused treatment constituted deliberate indifference, there is no Eighth Amendment violation because Mr. Ellis did not have an objectively serious medical condition.[2]

---

[2] To the extent Mr. Ellis appears to be arguing continued mistreatment after November 22, 2013, based on alleged discarded requests for medical treatment, there is no such claim alleged in the amended complaint. "[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)).

**B.      Conditions of Confinement—Cold Cell**

Mr. Ellis brings a claim against Sergeant Myers, Sergeant Sexton, and Officer Backus ("Officers") for failing to provide him adequate shelter in violation of the Eighth Amendment based on placing him in the cold intake receiving cell for two, three-hour periods of time on November 22, 2013. In their motion, the Officers argue that Mr. Ellis has failed to offer evidence to establish either a sufficiently serious deprivation or that they acted with deliberate indifference.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). However, the Constitution "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measures of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id*. at 298 (internal quotation marks omitted) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981)). In this context, a violation of the Eighth Amendment's cruel and unusual punishments clause consists of two elements: (1) objectively, whether the injury is sufficiently serious to deprive the prisoner of the minimal civilized measure of life's necessities, and (2) subjectively, whether the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. *Farmer*, 511 U.S. at 834. Although jail conditions may be "harsh and uncomfortable" without violating the Constitution, detainees are entitled to "the minimal civilized measure of life's necessities," which includes "protection from extreme cold." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997).

Before considering this test, the Court addresses an apparent factual dispute regarding the length of time Mr. Ellis was in a cold cell. When the case was screened, the Court allowed Mr. Ellis to proceed on his claim that the Officers placed him "in a freezing cold cell wearing only

boxer shorts for three hours on November 22, 2013." 8/1/2014 Order, p. 4, ECF No. 12. Mr. Ellis

testified at his deposition in November 2018 that he was cold during the three hours that he was

in the intake cell the first time, after throwing feces, from approximately 12:15 p.m. to 3:00 p.m.

*See* Pl.'s Supp., Ellis Dep. 10:19–11:17; 69:18–71:23. There is no testimony that Mr. Ellis was

cold when he was brought back to the cell for a second three-hour period beginning at

approximately 3:15 p.m. Yet, in his response brief to the Officers' motion for summary

judgment, Mr. Ellis asserts he was in a cold cell for six hours. Viewing the facts in the light most

favorable to Mr. Ellis, if he was cold from 12:15 p.m.–3:00 p.m. when he was in the intake cell

in his boxer shorts the first time, it is possible that he was cold in the intake cell for the time he

was in his boxer shorts from 3:15 p.m.–7:00 p.m.

Nevertheless, Mr. Ellis has not offered sufficient evidence that his placement in a "cold"

cell for two, three-hour periods was an objectively serious deprivation that would constitute an

Eighth Amendment violation. Whether a cold cell constitutes a constitutional violation requires

the Court to consider "the severity of the cold; its duration; whether the prisoner has alternative

means to protect himself from the cold; the adequacy of such alternatives; as well as whether he

must endure other uncomfortable conditions as well as cold." *Dixon*, 114 F.3d at 644.

As for the severity of the cold, Mr. Ellis has not offered any evidence of the temperature

in the cell and was unable to offer an estimate of the temperature when asked. Officers' Br., Ex.

A, Ellis Dep. 10:19–25. Mr. Ellis testified only that the cell was "very cold" and noted that this

occurred in November. *Id*. 10:23–11:1. Mr. Ellis described the intake cell as next to the garage

door, which allowed air to flow in. *Id*. 11:1–14. And he noted that there was an air conditioner

above the intake cell that blows air as well. *Id*. 11:16–17. However, Mr. Ellis has offered no

evidence or other testimony that the cell was excessively cold. *Flores v. O'Donnell*, 36 F. App'x

204, 207 (7th Cir. 2002) (finding that an inmate established a genuine issue of material fact regarding the temperature of his cell when he submitted an affidavit that he was exposed to extreme cold for approximately 18 hours before having access to any clothing); *see also Dixon*, 114 F.3d at 643 (finding that an inmate established a genuine issue of material fact by presenting evidence that, for several years, the temperatures averaged approximately 49 degree and at times fell below freezing during the winter).

Nor has Mr. Ellis offered evidence that he was exposed to extremely cold temperatures for an extended period of time. Without evidence of a severely cold temperature, the duration of two, three-hour periods of time of being in a cold cell in his boxer shorts, between and after which he was dressed and walked back to his cell, cannot fairly be characterized as an Eighth Amendment violation. *Compare Henderson v. DeRobertis*, 940 F.2d 1055, 1058–59 (7th Cir. 1991) (finding that the deprivation of blankets for four days in extreme cold could constitute an Eighth Amendment violation), *and Murphy v. Walker*, 51 F.3d 714, 721 (7th Cir. 1995) (holding that the inmate's contention that he was confined to a cold cell without clothes and heat in the middle of November for a week and a half was a sufficient allegation of inadequate heat and shelter), *with Bey v. Indiana*, No. 3:18-CV-119, 2018 WL 2560800, at *2 (N.D. Ind. Jun. 4, 2018) (noting the finding in *Dunn v. FUN Mitchell*, No. 3:14-CV-719, 2015 WL 338973 (W.D.N.C. Jan. 26, 2015), that "allegations of a single, isolated incident" where the plaintiff was left out in the cold and rain for seven hours did not amount to an Eighth amendment violation), *and Westbrook v. Archey*, No. 1:05-CV-57, 2006 WL 3191559, at *13 (N.D. Ind. 2006) (finding no constitutional violation when the inmate complained of the cold on January 19 and was given a blanket the following day and the inmate did not offer evidence as to the severity of the cold); *Clark v. Spey*, No. 01 C 9669, 2002 WL 31133198, at *2 (N.D. Ill. Sept. 26, 2002) (finding that

plaintiff's allegations that he was "placed in a cold and unlighted cell where he was deprived of warm clothing, a functioning toilet, toilet paper, a mattress, sheets, and a blanket for a period of several hours" were insufficient to state a claim for constitutional deprivation).

For alterative means to protect himself from the cold, Mr. Ellis testified that he tried to warm himself by keeping his body moving. Pl.'s Supp., Ellis Dep. 71:15–20. Finally, Mr. Ellis does not identify any other uncomfortable conditions that he was made to endure along with the cold other than his minor injuries. When considering all of the factors in combination, Mr. Ellis has not demonstrated that the Officers violated the Constitution when they placed him in the cold intake receiving cell for two, three-hour periods.

Moreover, Mr. Ellis has not offered evidence that the Officers were deliberately indifferent to the alleged deprivation because he has not shown that they knew that he was cold and failed to act. To prove an Eighth Amendment violation based on conditions of confinement, Mr. Ellis must offer evidence that the Officers knew of and disregarded "an excessive risk to [Mr. Ellis'] health or safety; the [Officers] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Boyce v. Moore*, 314 F.3d 884, 888 (7th Cir. 2002) (quoting *Farmer*, 511 U.S. at 837). As noted above, there is no evidence that there was an excessive risk to Mr. Ellis' health or safety. Certainly, the Officers were generally aware of the temperature of the intake receiving cell based on their time in the cell transporting Mr. Ellis and then removing his clothing. But, other than his speculation as to the Officers' motives for removing his clothes to make him cold, Mr. Ellis has not offered any evidence that the Officers knew that he was cold in the intake receiving cell. Mr. Ellis testified that he did not have the opportunity to tell anyone that he was cold, but he also testified that he did not attempt to tell anyone that he was cold. He also testified

that the Officers did not tell him why he was stripped. Officer Myers stated in his interrogatory responses that Mr. Ellis' clothing was removed so that custody could check for weapons that could be used against staff or objects that bodily fluid could be stored in.

Because Mr. Ellis has not offered evidence that he was exposed to excessively cold temperatures that subjected him to a substantial risk of serious harm or that the Officers had reason to know that Mr. Ellis was cold, summary judgment in favor of the Officers is proper on Mr. Ellis' Eighth Amendment claim based on being held in the cold intake cell.

## C.     Qualified Immunity

The Officers also argue that, even if the Court finds that they violated Mr. Ellis' constitutional rights, they are entitled to qualified immunity. The defense of qualified immunity, which protects government officials from liability for civil damages, requires a two-part inquiry: (1) whether the facts alleged by the plaintiff show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The steps can be assessed in either order. *Id*. at 236. Because Mr. Ellis has failed to meet his burden on summary judgment of demonstrating that the Officers' conduct violated his constitutional rights, the Officers are entitled to qualified immunity.

## IV.  Conclusion

For the reasons stated above, Nurse Lukac's motion for summary judgment [DE 164] and Sergeant Myers, Sergeant Sexton, and Officer Backus' motion for summary judgment [DE 167] are GRANTED. The case remains pending on Mr. Ellis' Eighth Amendment excessive force claim against Sergeant Myers, Sergeant Sexton, and Officer Backus.

SO ORDERED.

ENTERED:  September 4, 2019

                        /s/ JON E. DEGUILIO
                        Judge
                        United States District Court